925 So.2d 34 (2006)
STATE of Louisiana
v.
Randy ROSE.
No. 2005-KA-0396.
Court of Appeal of Louisiana, Fourth Circuit.
January 18, 2006.
*35 Eddie J. Jordan, Jr., District Attorney, Meri M. Hartley, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Kevin V. Boshea, Metairie, LA, for Defendant/Appellant.
(Court composed of Judge TERRI F. LOVE, Judge MAX N. TOBIAS JR., and Judge LEON A. CANNIZZARO JR.)
MAX N. TOBIAS, JR., Judge.
The defendant, Randy Rose ("Rose") was charged by grand jury indictment on 29 January 2004 with second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty at his arraignment on 3 February 2004 and filed motions. A hearing was held on 19 February 2004 on his motions. At the conclusion of testimony from the investigating officer, Detective Ronald Ruiz, Rose withdrew all motions.
*36 The state filed a notice of intent to use evidence of other crimes in conformity with State v. Prieur, 277 So.2d 126 (La. 1973) and La. C.E. art. 404 B(1). At the same time, the court scheduled a sanity hearing for 4 March 2004. At the conclusion of the sanity hearing, the trial court found the defendant competent to stand trial.
A Prieur hearing was held on 24 March 2004. On 7 April 2004, the trial court granted the state's Prieur motion. Rose notified the court of his intent to file a writ with the court of appeal, and the trial court stayed the proceedings. A written judgment was issued on 8 April 2004. This court granted Rose's writ application and denied relief. State v. Rose, 2004-K-0693 (La.App. 4 Cir. 5/20/04), unpub., and the Louisiana Supreme Court denied Rose's writ application. State v. Rose, XXXX-XXXX (La.6/16/04), 876 So.2d 788.
Trial commenced on 30 August 2004. On the following day, the jury found the defendant guilty as charged. On 30 September 2004, the trial court denied defendant's motion for new trial. On 1 October 2004, the trial court sentenced the defendant to life imprisonment without benefit of parole, probation, or suspension of sentence. On 17 November 2004, the trial court granted Rose's motion for an out-of-time appeal.

FACTS.
Detective Ronald Ruiz, a homicide detective with the New Orleans Police Department, testified that on 24 November 2003, at approximately 7:45 p.m., he was dispatched to 726 Elmira Street in New Orleans to investigate a possible homicide. Upon arrival, he was directed to the bathroom where he observed the victim, Lisa James Rose ("Ms. Rose"), lying nude in the bathtub in the fetal position with her head underneath the faucet. Detective Ruiz observed a number of partially dissolved white pills on top of her head and on portions of her body, suggesting that the tub had previously been filed with water. More pills were scattered on the floor, and three pill bottles were recovered from the floor and the tub itself. Detective Ruiz learned that the victim's daughter had arrived home and found her mother unresponsive and that emergency medical technicians had pronounced Ms. Rose dead at the scene. Detective Ruiz noted that no signs of forced entry to the residence existed. The scene was photographed and the neighborhood was canvassed to see if anyone had seen anything unusual.
The following morning, Detective Ruiz learned from the coroner's office that the death had been classified as a homicide and that the cause of death was strangulation. Detective Ruiz related that the coroner had placed the time of death between 10:00 and 11:00 the previous morning. Detective Ruiz returned to residence and met with the victim's daughter, Ashley James ("Ms. James"). Ruiz learned that Ms. James was unable to locate the clothes that her mother had been wearing the previous day. Furthermore, Ms. James noted that a fresh garbage bag had been placed in the garbage can the previous morning and that it was no longer present. The two looked outside to see if any garbage had been placed there and found nothing. At that point, Ms. James advised Detective Ruiz that often when the trash contained seafood or something likely to cause an odor, her stepfather, Randy Rose, would take the garbage to a dumpster locate nearby behind Martin Behrman High School.
Detective Ruiz proceeded to the dumpster which was located around the corner from the residence and located a trash bag inside containing some clothing. Subsequently, Ms. James identified several articles *37 of clothing recovered from the bag as belonging to her mother and also some articles belonging to Rose. Among the articles was a blue skullcap that had been ripped, as well as a purple bra that had been ripped. The crime lab was summoned and documented the scene. After both the victim's and Rose's clothes were located together, Detective Ruiz completed a background check on Rose and learned that he had been convicted of manslaughter after having killed his first wife; he had been released on parole in May 2002.
Detective Ruiz also spoke with the victim's son, Allen James ("Mr. James"), who related that his mother and Rose were involved in an argument on the morning of the 24th over a traffic ticket that Rose had received for parking in a handicap zone. Mr. James related that he hurried up and got dressed so that his mother could take him to work. He believed that her taking him to work would provide a cooling off period. Mr. James advised that his mother dropped him off at work at the Oakwood Mall at 9:45 a.m. and that she told him that she was going home to get ready for a doctor's appointment scheduled for sometime around 10:00 a.m. Detective Ruiz related that there was a message on the answering machine at the residence from the Medicaid Office concerning rescheduling Ms. Rose's appointment, as she had missed her appointment that day.
At this point, Detective Ruiz prepared an arrest warrant for Rose. Subsequently, Detective Ruiz was informed that there was a woman at the Fourth District station with information regarding Rose's whereabouts. Detective Ruiz proceeded to the station where he met with Candice Mitchell ("Ms. Mitchell") who informed him that on the previous day Rose had appeared at her house and asked to borrow her car to make a court appearance. She further informed the detective that at around midnight that evening she received a telephone call from Rose who stated that he was in Texas, that something had happened, and that he could not come back to New Orleans. At that point Ms. Mitchell contacted the police and reported her car stolen.
Ultimately, Rose turned himself in on 26 November 2003. Detective Ruiz stated that as he was speaking with Rose he noticed that Rose kept covering his right hand. Detective Ruiz asked him to lay his hand on the table at which point he observed that Rose had what appeared to be a fingernail scratch on his right hand by his thumb. A crime lab technician documented the injury.
Subsequently, Detective Ruiz proceeded to Rose's place of work in Avondale. He met with a senior security officer who informed Ruiz that Rose was absent from work on November 24th.
The parties stipulated that Gerald Liuzza, M.D., a pathologist with the Orleans Parish Coroner's Office, was an expert in forensic pathology. Dr. Liuzza performed an autopsy on Ms. Rose on the morning of 25 November 2003. Dr. Liuzza classified Ms. Rose's death as a homicide, being caused by manual strangulation. Dr. Liuzza's examination revealed petechial hemorrhages between the victim's eyelids which were reflective of an increase in blood pressure to the head and neck area caused by some constriction or strangulation about the head and neck. A small scrape was detected on the outside of the neck, and bruising in three separate areas was detected in the long slender muscles that run along the inside of the neck and over the voice box. Petechial hemorrhages were also detected on the inside of the voice box. Also, an area of hemorrhage was detected along the hyoid bone above the voice box. Two areas of hemorrhage were detected on the back of the head. *38 Also bruising was detected at the area of the base of tongue. Dr. Liuzza opined that a significant amount of force was required to have disrupted tissues at the level that was observed. He also noted that the toxicology results were negative for the presence of drugs or alcohol.
Mr. James testified that he had been living with his mother for approximately three months after returning home from service in the Air Force. On the morning of 24 November 2003, his mother awakened him at approximately 9:00 a.m. Mr. James began to iron his clothes when he heard his mother and stepfather arguing over a traffic ticket. He noted that his stepfather was quite angry.
Mr. James testified that his mother dropped him off at work at the Oakwood Mall at 9:30 a.m. He stated that his mother had a doctor's appointment for 10:00 a.m. that morning. He stated that they had planned for her to pick him up from work at 4:00 p.m. whereupon he would take his mother home and take the car to his second job.
Before they left, Mr. James' stepfather asked him if he planned to come home between his two jobs. Mr. James told him that he did not. Furthermore, Mr. James noted that he felt strange after his stepfather had asked him the question because it was unusual that he would ask him about his whereabouts for the day.
Mr. James testified that he waited for his mother to arrive and when she did not, he called his sister who arranged for his grandmother to pick him up. Mr. James was quite worried about his mother and questioned whether she had been involved in an automobile accident or whether something else had happened to her. He began calling the house after he arrived at work but no one answered. At approximately 9:00 or 9:30 that evening his uncle arrived at his job and informed him of what had happened, and he hurried home.
Mr. James testified that on that morning he observed his stepfather in bed wearing what he called a "blue wave cap." He recalled that his mother was wearing a brown colored sweat suit.
Ms. James testified that her final examinations at Delgado Community College were on November 24th. That morning, her mother drove her to school where she arrived at approximately at 8:10 a.m. She returned home between 9:45 and 10:00 that morning to retrieve her keys. Ms. James' mother, brother, and stepfather were at the house at that time. Ms. James then went to a friend's house to eat breakfast. After eating breakfast, she reviewed some of her study guides and then called Richard Wilson, a close family friend with whom she maintained a relationship, at his job. He put her on hold, and she eventually hung up and then returned to school.
Ms. James' last class ended sometime around 1:00 p.m. that day. She waited at school until approximately 2:00 p.m. for her boyfriend. After he arrived, she went back to her house to drop off her books and to pick up a check. Her boyfriend stayed in the car. She related that the house looked normal at that time and that nothing was out of place. The lights were off except for the bathroom light, which they normally kept on, and no one appeared to be home. She did not go into the bathroom.
From her house, Ms. James traveled to several shopping malls. That afternoon, she received a call from her brother, Mr. James, who let her know that their mother had failed to pick him up after work and that he needed a ride to his second job. She telephoned her grandmother and arranged for her to pick up her brother.
*39 Ms. James completed a few more errands and then called her mother's best friend, whom she called her "aunt." Ms. James told her "aunt" that she had not heard from her mother and that she had been looking for her all day. Her "aunt" had not heard from her mother either. The "aunt" agreed to meet her at the James' house.
The two arrived at the house at the same time. The door was locked. Once inside, she began telephoning hospitals and the police to see if anything had happened to her mother or stepfather. Then she went into her mother's bedroom to see if she had left a note. She looked in the refrigerator and noticed that her stepfather's lunch for work was still there. She noticed that the bathroom light was still on and looked in because something told her to. She noticed that the area around the sink was in disarray, which she knew would upset her mother, so she entered. At that point she found her mother. Ms. James began to scream and then she touched her mother's body. She tried to move her arms but could not because, as she said, "everything was hard." Distraught, she called 911. Eventually, the authorities arrived.
The next morning when Ms. James returned to the house she was unable to locate the clothes her mother had worn the previous day. Then she noticed that the trash bag was missing from the garbage can. Detective Ruiz came to the house to inform her of the results of the autopsy. Ms. James mentioned that her mother's clothes and the trash bag were missing. She also noted that on occasion her stepfather would take their trash to the dumpster around the corner by the school. Shortly thereafter, Detective Ruiz telephoned her and asked if she could come to the dumpster to possibly identify some clothing that he had recovered. She came immediately and identified her mother's underwear and the sweatpants and top that she was wearing that day. Also, she identified the shirt her stepfather was wearing that day, a pair of his socks, and his skullcap. She also identified a towel from their bathroom and a pillow that her mother had made for her, as well as a pair of her own socks.
Ms. James stated that the family owned two cars, a white Ford Taurus and a burgundy Oldsmobile Achieva. Her mother was driving the Achieva that day. When she returned home that evening neither of the vehicles was at the house. She had not seen the Achieva since that day.
Richard Wilson ("Mr. Wilson") testified that he had a close friendship with Ms. Rose for many years beginning when her children were toddlers. He stated that he had helped raise the children as if they were his own. Subsequently, Mr. Wilson got married and his relationship with the children became much more limited. Nevertheless, he maintained contact with them over the years. On the morning of November 24th he received a telephone call from Ms. James at work. He was forced to place her on hold, and when he got back to the call the two had been disconnected. Mr. Wilson called Ms. James back at her home at approximately 9:45 or 10:00 that morning, and Rose answered the phone. Mr. Wilson explained that Rose believed that he was calling for Ms. Rose despite Mr. Wilson's explanation that he was calling for Ms. James. Rose became irate and accused Mr. Wilson of still having a relationship with Ms. Rose. Mr. Wilson stated that Rose went on and on despite his continued efforts to explain that he was only returning Ms. James' phone call. He said that Rose made a threatening statement to the effect of, "I'm going to bring the heat." Eventually, Rose hung up.
*40 Ms. Mitchell testified that on November 24th Rose stopped by her house in Gretna between 2:30 p.m. and 3:00 p.m. She and Rose had been romantically involved briefly when she was sixteen. She explained that they had maintained a friendship ever since. She stated that they talked for a while and that he asked if he could use her car to go to traffic court in Gretna. Ms. Mitchell recalled that the hearing was for 5:00 p.m. and that Rose left at 4:00 p.m. She stated that this was the first time he had asked to borrow her car, but that because they were friends it was not a problem.
Ms. Mitchell related that Rose was supposed to return the car after traffic court but that by 12:30 a.m., when he had not returned the car, she reported it stolen to the police. Ms. Mitchell stated that she received two calls from Rose early on November 25th. The first call was from Lake Charles, Louisiana, and the second was from Houston, Texas.
Lt. Curtis Snow of the Jefferson Parish Sheriff's Office testified that on 18 November 1991, he was dispatched to the scene of a possible homicide in Gretna, Louisiana. The dispatcher informed him that a woman identified as Betty Rose had called 911 to report that her son had killed his wife and that he was returning to the scene to kill himself. Lt. Snow was the first officer at the scene. He kicked the door of the apartment door open, and after turning on the lights, he observed a pair of legs protruding from behind the kitchen counter on the floor. He removed a blanket, which was partially covering the victim, and observed that the victim had sustained multiple stab wounds to the upper chest area. Lt. Snow identified the victim as Monica Rose. The apartment in question was rented to Rose, the victim's then husband, and he was identified as the suspect. The detective learned the two had separated in September of 1991. An arrest warrant was obtained for Rose; however, he had fled the area, first to Biloxi, Mississippi, and then to Atlanta, Georgia, eventually turning himself in to the FBI in Atlanta.
The state filed and introduced certified copies relative to the defendant's indictment for second degree murder and evidencing that he subsequently pled guilty to manslaughter and was released on parole on 13 May 2002.
The state also filed certified copies of documents reflecting that Rose was charged with criminal damage to property and unauthorized use of a movable and that he pled guilty to criminal damage to property and that the other count was dismissed. The state also filed a certified copy of documents reflecting that Rose was charged with attempted second degree murder of Monica Young and that he pled guilty to illegal use of a firearm. The state also introduced a certified copy of a marriage certificate evidencing that Rose and Monica Young were married.
Officer Tindell Murdock of the New Orleans Police Department testified that on 25 August 2003 he responded to a complaint of domestic violence at 726 Elmira Street. He met with the victim, Ms. Rose, who informed him that she had been involved in a verbal argument with her husband, Rose, that morning at approximately 9:00 a.m. Apparently, Rose had become angry because she did not want to look at him as he talked to her. Rose then grabbed her by the head and forced her to look at him. When she attempted to pull away he began striking her about the head, face, and body. Officer Murdock observed that Ms. Rose's upper and lower lips were bruised and that she had minor swelling to her face and arms. Officer Murdock used a camera to document the victim's injuries. The state introduced the photograph into evidence.
*41 Rose's mother, Betty Rose, testified for the defense. She stated that on 24 November 2003, Randy came to her house at approximately 10:30 a.m. She recalled the time because she was watching "The Price is Right" when he arrived. She stated that he stayed at the house until 2:00 p.m.
Betty Rose also acknowledged that her son lived with her off and on for several months preceding Ms. Rose's death.
Randy Rose testified in his own defense. Rose stated that he and his wife did not argue that morning, asserting that they simply discussed the fact he had to go to court and that he did not have all the money to pay the traffic ticket.
Rose stated that he left his house at approximately 10:00 or 10:15 that morning and went to his mother's house. He acknowledged speaking with Mr. Wilson that morning. He recalled that the conversation occurred at five or ten minutes to 10:00. He acknowledged that the two argued but did not describe it as heated. He did not believe that Mr. Wilson and his wife were having an affair, but he did believe that Mr. Wilson wanted to get back together with his wife. Rose stated that when he left his house his wife had yet to return.
Rose stated that he stayed at his mother's house until approximately 1:30 p.m. or 2:00 p.m., when he went to Ms. Mitchell's house. He stated that they talked for a while and that he left at about 4:30 p.m. or 5:00 p.m. He recalled that he decided not to go to court because he did not have the money to pay the ticket. He stated that he decided to go to work instead as he was eligible for a bonus and did not want to miss too much time. Rose stated that he rode around a while and checked with some friends in an effort to get the money and then decided to call his mother's house. His sister answered the phone and told him to hold because Ms. James was on the other line. When his sister got back on she reported that Ms. James was screaming and that she said he, Rose, had murdered her mother. Rose told his sister that he did not do that. At this point, Rose stated that he panicked and that he just started driving, and that he found himself in Lake Charles and then crossed the line into Texas. Rose stated that he then began to collect his thoughts and realized that he had no reason to run. He stated that he was scared because he had just gotten out of prison and that it was already suspected he was the one who committed the crime.
Regarding his first wife's death, Rose explained that at the time, he had just completed working almost thirty hours straight without any sleep. He stated that at the time he felt his life was in danger because his wife had previously threatened his life. He stated that a little while after he got home they started to argue. He stated that she reached for a knife, that they struggled over the knife, and that she wound up dead.
Rose explained that the injuries depicted in the photograph of his second wife were not caused by his beating her but by his holding her. He stated that the two were having an argument, that she started to swing at him, and that he held her down. He acknowledged that she put a peace bond on him. He stated that soon thereafter she began to call him at his mother's house because she wanted to see him and that when they went to court she withdrew the battery charge.
Returning to a description of the day of the murder, Rose stated that he drove the white Taurus to his mother's house and that he took his mother's gold car as it had an oil leak and he wanted to get it checked or put some oil in it. He drove the gold car to Candice Mitchell's house and then *42 asked to borrow her car because he had not had a chance to put any oil in the car and he did not want to take a chance burning the motor up.
Rose denied wearing a blue skullcap that morning.
Regarding the first incident involving his first wife, Rose stated he began carrying a firearm after his wife's family began threatening him. He stated that he was driving and happened to see his wife. She presented what he believed was a firearm, and he discharged his weapon. He denied having run her off the road. He stated that her car veered into the car that he was driving. His car, which he had borrowed, became inoperable and he took her car after she ran inside the residence where she worked because he needed to go some place where he could calm down. Rose stated that he had no intention of hurting his fiancée, and soon to be wife, that day. He stated that he did not fire a weapon at her.
Rose acknowledged that his marriage to his first wife began breaking up two months after they were married. Prior to the homicide his first wife had moved out of the house and Rose had gotten his own apartment. On the night in question she brought him some groceries. Rose denied stabbing her eighteen times, stating that it was only three. Rose stated that after the murder he drove to Mississippi where he attempted to commit suicide in his car by slitting his wrist. He was treated at a nearby hospital and subsequently took a bus to Atlanta where he turned himself in.

ERRORS PATENT.
A review for errors patent reveals none.

ASSIGNMENT OF ERROR NUMBER 1.
Defendant contends it was error to admit the evidence of defendant's prior bad acts. As noted previously, the trial court's ruling on the state's Prieur motion was previously reviewed by this court on Rose's writ application. Generally, an appellate court will not reverse its pretrial determinations unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result. State v. Gillet, 99-2474, p. 4 (La.App. 4 Cir. 5/10/00), 763 So.2d 725, 728, citing State v. Taylor, 550 So.2d 712, 718 (La.App. 2 Cir.1989), writ denied, 556 So.2d 54 (La.1990). Generally, review of this assignment of error is limited to whether there was palpable error in denying defendant relief in his previous writ application. However, our review of Rose's earlier application for supervisory writs on this issue discloses that it was unclear and thus unknown whether Rose would use the defense of accident or lack of specific intent. Moreover, the standard of review of the writ application was abuse of discretion. Now that we have a complete record before us so that we may now ascertain the state's theory, the defense, and the complete development of the facts, we can better determine whether it was proper to admit prior crimes evidence pursuant to Prieur. We therefore conclude that we are not bound by our earlier ruling on writ number 2004-K-0693.
La. C.E. art. 404 B(1), the controlling statutory authority on this issue provides:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any *43 such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, a court may not admit evidence of other crimes to show a defendant is a man of bad character who has acted in conformity with his bad character. State v. Brown, XXXX-XXXX, p. 6 (La.App. 4 Cir. 3/31/04), 871 So.2d 1240, quoting State v. Taylor, XXXX-XXXX, p. 10 (La.1/14/03), 838 So.2d 729, 741, cert. den., Taylor v. Louisiana, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004).
However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason for its admissibility, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. LSA-C.E. art. 404(B)(1). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. State v. Prieur, 277 So.2d at 130. Additionally, the State must prove that the defendant committed the other acts. Id. Finally, the probative value of the other crimes, wrongs or acts evidence must outweigh its prejudicial effect. LSA-C.E. art. 403; State v. Hatcher, 372 So.2d 1024, 1033 (La.1979).
State v. Galliano, 2002-2849, pp. 2-3 (La.1/10/03), 839 So.2d 932, 933 [Footnote omitted.].
In State v. Arrington, 97-2059, pp. 7-8 (La.App. 4 Cir. 4/21/99), 738 So.2d 1087, 1091, this court discussed the use of evidence of other crimes to show intent:
Before evidence of other crimes is admitted as proof of intent, three prerequisites must be satisfied: (1) the acts must be similar, (2) there must be a real genuine contested issue of intent at trial, and (3) the probative value of the evidence must outweigh its prejudicial effect. State v. Romero, 574 So.2d 330, 336 (La.1990); State v. Kahey, 436 So.2d 475, 488 (La.1983). In addition, there must first be clear and convincing evidence of the commission of the other crimes and the defendant's connection with them. State v. Hatcher, 372 So.2d 1024, 1033 (La.1979); State v. Prieur, 277 So.2d 126, 129 (La.1973), State v. Gibson, 511 So.2d 799, 801 (La.App. 4 Cir.1987), writ denied, 514 So.2d 1174 (La.1987). Further, where the testimony shows that the factual circumstances of the prior acts and the crime charged are virtually identical, the evidence of the other crimes is corroborative of the victim's testimony and establishes a system or plan. State v. Johnson, 96-0950 (La.App. 4 Cir. 8/20/97), 706 So.2d 468, 477, writ denied, 98-0617 (La.7/2/98), 724 So.2d 203, cert. denied, Johnson v. Louisiana, 525 U.S. 1152, 119 S.Ct. 1054, 143 L.Ed.2d 60 (1999); State v. Tolliver, 621 So.2d 17, 19 (La.App. 2 Cir.1993).
Although this court in Arrington declared that there must be clear and convincing evidence of the defendant's commission of the prior offense, the Louisiana Supreme Court has consistently stated that it has not yet reached the issue of whether the burden of proof should be by clear and convincing or a preponderance of the evidence by finding that the evidence of other crimes had been sufficiently proven under either standard.[1] A trial court's *44 ruling on the admissibility of evidence pursuant to La. C.E. art. 404 B(1) will not be disturbed absent an abuse of discretion. State v. Gibson, 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220.
In Arrington, the defendant was convicted of aggravated battery for attacking his wife with a knife. The state introduced evidence of a prior aggravated battery committed by the defendant upon his wife the year before. The victim and her daughter testified as to the offense and the prior battery. The defendant admitted he pleaded guilty to the criminal charge of aggravated battery that arose from the earlier incident and served six months in jail for the offense. This court concluded that there was clear and convincing evidence that the defendant attacked and stabbed the victim in September 1994, and the 1994 offense and the later offense were strikingly similar. On both occasions the defendant without provocation attacked his wife with a knife; he stabbed her and attempted to strangle her. This court held that the trial court did not err when it allowed testimony concerning the prior offense into evidence. Id., 97-2059, at p. 89, 738 So.2d at 1091-92.
In State v. Williams, 95-0579 (La.App. 4 Cir. 4/10/96), 672 So.2d 1150, the state sought introduction of evidence of prior beatings and threats allegedly committed by the defendant against the victim of the second degree murder, his wife. This court noted that the state intended to show that the defendant had a specific intent to kill and inflict great bodily harm on the victim, and such evidence was relevant as the defendant contended that the shooting was accidental. This Court concluded that the state proved the prior beatings and threats by clear and convincing evidence with the testimony of the victim's daughter and her sister as to an incident of baseball bat beating. The victim's daughter also related other incidents of abuse and threats. The son acknowledged that his father beat and threatened his mother on numerous occasions. The victim's friend testified that she saw the defendant beat the victim while she was pregnant and heard him threaten to kill the victim if she did not let him into her house. This court upheld the trial court's decision to admit the evidence relating to the defendant's prior acts of abuse and threats against the victim. Id., pp. 12-13, 672 So.2d at 1157.
*45 In State v. Hamilton, 99-523 (La.App. 3 Cir. 11/3/99), 747 So.2d 164, the state gave notice of its intent to introduce evidence about the defendant's prior abuse of his wife, one of the murder victims in the case, and the trial court found that the evidence was admissible. The defendant did not deny that he committed the prior acts of abuse against his wife or that the evidence of other crimes refuted his claim that he acted in sudden passion or heat of blood when he killed the wife. The defendant simply claimed that the evidence's probative value was outweighed by its prejudicial impact. The Third Circuit concluded:
In the present case, the Defendant's murder of his estranged wife occurred after he had forcibly entered her home in violation of a court-issued protective order and physically beaten her until she was unconscious, a classic example of domestic violence. There would hardly be any evidence more "prejudicial" than evidence of the Defendant's prior acts of physical and emotional abuse of his wife. In [State v.] Germain, 433 So.2d 110 [La.1983], the supreme court explained that "prejudicial," when used in the context of limiting the introduction of other crimes evidence, means "only when it is unduly andunfairly [sic] prejudicial." Id., at 118. In Germain, the defendant, charged with murdering his stepdaughter by beating her, claimed that evidence of his prior beatings of the victim several weeks before her death was "prejudicial" and thereby inadmissible; however, the supreme court ruled that this evidence was not unduly and unfairly prejudicial. The two murders giving rise to the charges against the Defendant arose out of an act of domestic violence. The Defendant's prior abuse of his estranged wife, the first murder victim in this case, was undoubtedly prejudicial; it showed a pattern of abuse and rebutted the claim that Defendant acted in sudden passion or heat of blood. However, it was not unduly and unfairly prejudicial in light of its relevancy. We reject this argument.
Id., at pp. 11-12, 747 So.2d at 170-71.
In State v. Fortino, 2002-708 (La.App. 5 Cir. 12/30/02), 837 So.2d 684, the state filed a written Prieur notice detailing two prior incidents in which the defendant physically attacked his second estranged wife, Constantino Lopipero, who was the current victim of second degree battery, and two prior attacks on his first wife who divorced him, Angela Fortino. The second degree battery involved the defendant choking his wife to unconsciousness and then beating her about the head and face. The state asserted that it would use those acts to show the defendant's knowledge, intent, guilty knowledge, system, and motive. At the Prieur hearing, Lopipero and Fortino gave detailed and uncontradicted testimony regarding the beating incidents alleged in the written notice.[2] The Fifth Circuit declared that the state proved the other crimes by a preponderance of the evidence, as well as by clear and convincing evidence. The court concluded:
We next find that the Prieur incidents were relevant for a purpose other than to show that Defendant committed the charged offense, or that he was simply a bad person. They were valid to show specific intent, an element of the charged offense. Although the Defendant argues that second degree battery *46 is not a specific intent crime, and that other crimes evidence is not permitted to show general intent, the argument is not legally supportable. Second degree battery is a specific intent crime and the State was required to prove intent. State v. Fuller, 414 So.2d 306, 310 (La. 1982); State v. Druilhet, 97-1717, p. 3 (La.App. 1st Cir.6/29/98), 716 So.2d 422, 423.
The prior crimes also show motive and system. Both Lopipero and Fortino testified that the Defendant beat them when he felt they were not showing him "respect." The prior acts detailed by the two women were remarkably similar to the acts alleged in the instant case. In each instance, the Defendant flew into a rage without provocation and inflicted severe injuries on his wives. As in the instant case, the Defendant choked the victims in the prior acts.
We further find that the probative value of the Prieur evidence outweighed any prejudice to the Defendant. At trial, the Defendant testified that he often became angry with his wives and that he hit them when he was angry. He knew that it was wrong, but it relieved his anger. When asked about the incident on May 26, 2001, in which he was alleged to have grabbed Lopipero by the neck and thrown her against a bedroom vanity, the Defendant claimed that he merely picked her up and sat her on the vanity in an effort to calm her. With respect to the February of 2001 incident in which the Defendant was alleged to have slammed Lopipero's head against the window of his vehicle, he stated that he only grabbed her by the shirt.
Based on the foregoing, we find that the trial judge did not abuse his discretion in admitting the evidence of other crimes and that the State met its burden of proof in that regard.
Id., at pp. 9-10, 837 So.2d at 690.
Rose argues that the 1991 manslaughter conviction was improperly admitted because the crime fails to meet the criteria for the introduction of evidence of other crimes under the theory of identity or modus operandi, as the evidence of the two crimes is not so peculiarly distinctive that one must logically believe that they are the work of the same person. State v. Moore, 440 So.2d 134 (La.1983).
Principally, Rose notes that whereas his first wife was stabbed, Ms. Rose was strangled. Rose adds that in the first homicide there was no evidence of suicide, that he was not separated from his second wife at the time of the homicide, and that there was no evidence that a fight preceded the first homicide. Finally, Rose notes that the body of his first wife was found in the kitchen while Ms. Rose's body was found in the bathroom.
We agree that Rose makes a valid argument of the insufficient similarities between the two crimes from which one could conclude that they were "signature" crimes such that one could reasonably infer by the means in which the homicides were accomplished that the same person was the perpetrator in both incidents. However, as the prior review of case law demonstrates, admissibility of Prieur evidence is not limited to such "signature" crimes.
Although a certain number of dissimilar aspects of the two crimes exist, we note a certain measure of similarities between the two crimes does exist. Of course, the most obvious common element involves the fact that the two crimes involve the death of a wife of the defendant. Furthermore, although Rose's first wife was stabbed to death while his second wife, the victim, was not, the two homicides involved close *47 physical contact of an especially brutal nature. Both crimes were committed in the defendant's home. Both crimes occurred after a previous incidence of violence by the defendant against his wife and both crimes followed a recent separation. Additionally, after each incident, Rose fled.
Rose's previous conviction for manslaughter could be said to be probative given the peculiar facts surrounding the staging involved following Ms. Rose's death. It is apparent that the perpetrator attempted to conceal the fact that a homicide had been committed by creating the suggestion that Ms. Rose had committed suicide. Accordingly, it is evident that whoever committed the crime, even though it was not witnessed, was concerned that suspicion would center on him or her had it been apparent that Ms. Rose had been murdered. However, we find that the similarities between Ms. Rose's murder and the other crimes that Rose was previously charged with are not substantially similar to the crime in the case at bar. We do not find that C.E. art. 404B and Prieur have been properly applied. We find that it was clearly and convincingly error for the trial court to have permitted the introduction of prior crimes committed by Rose.
Given that Rose was charged with second degree murder, the penalty for which was life imprisonment without the benefit of parole, probation or suspension of sentence, we find it inappropriate to apply the harmless error rule of La.C.Cr.P. art. 921 because substantial rights of the accused were violated and he was prejudiced thereby. State v. Pierfax, 158 La. 927, 105 So. 16 (La.1925). By introduction of the evidence of the prior manslaughter conviction, Rose was effectively forced to testify because of the ability of the prosecution to question Rose about that prior conviction and the facts surrounding it. We thus find Rose's rights under Article I, § 13 of the Louisiana Constitution have been violated, putting aside any violation of the Fifth Amendment to the U.S. Constitution. The differences between the facts of the crime at issue and the facts surrounding Rose's prior manslaughter conviction are too different to warrant the admission of the evidence relating to the manslaughter.[3] We do not find the Prieur evidence harmless in the context of a second degree murder charge. The assignment of error has merit.

ASSIGNMENT OF ERROR NO. 2.
In his second assignment of error, Rose contends the evidence was insufficient to support his conviction. In light of our ruling on Rose's first assignment of error, we pretermit a discussion of this assignment.

CONCLUSION.
Accordingly, we reverse the conviction and sentence of the defendant and remand this case to the trial court for a new trial.
REVERSED AND REMANDED.
CANNIZZARO, J., Dissents with Reasons.
CANNIZZARO, J., Dissenting with Reasons.
I respectfully dissent form the majority opinion, because I do not believe that it was error to allow the introduction of Mr. Rose's prior crimes into evidence. Therefore, I would uphold Mr. Rose's conviction and sentence.

Applicable Law
Although I agree with the majority's statement of the law, I do not agree with *48 their application of the law in this case. After discussing the law, the conclusion reached by the majority is, in my opinion, a non-sequitor. The cases cited by the majority do not support their conclusion in this case on the issue of the admissibility of evidence of prior crimes.
La. C.E. art. 404(B)(1) provides in relevant part as follows:
[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding
In the instant case, the prosecution complied with the notice requirements of this statute, and Mr. Rose is not contesting the notice given to him. He bases his assignment of error with respect to his prior crimes on the inadmissibility of the evidence of those crimes.
The prosecution is entitled to admit evidence of his prior crimes if such evidence is for the purposes permitted by La. C.E. 404(B)(1). Therefore, the evidence of Mr. Rose's prior crimes can be used (1) to prove that he had the specific intent to kill or inflict great bodily harm on Lisa Rose, (2) to prove that her death was not the result of an accident or suicide, or (3) to prove that it was Mr. Rose who killed Lisa Rose.
In State v. Arrington, 97-2059 (La.App. 4 Cir. 4/21/99), 738 So.2d 1087, this Court held that three prerequisites must be satisfied before evidence of other crimes can be used to prove a defendant's intent in committing a crime. The three prerequisites set forth in Arrington are that "(1) the acts must be similar, (2) there must be a real genuine contested issue of intent at trial, and (3) the probative value of the evidence must outweigh its prejudicial effect." 97-2059, p. 7, 738 So.2d at 1091. Additionally, there must be clear and convincing evidence that the defendant committed the other crimes. Id.
The majority discusses several cases that involve domestic abuse.[1] The facts in those cases are not dissimilar to those in the instant case, and in each of those cases, the evidence of prior abuse was held to be admissible evidence.
Additionally, in State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, the Louisiana Supreme Court upheld the admissibility of evidence of a prior robbery in a first-degree murder case, where the defendant had committed a murder while engaged in the commission of an armed robbery. The Supreme Court held that "the evidence of the Pizza Hut robbery was admissible to prove motive, intent, knowledge, and absence of mistake or accident in connection with proving the element of the state's first degree murder case (that defendant was engaged in the commission of an armed robbery) and to rebut his claim of self-defense." 655 So.2d at 1331. The Supreme Court held that "[g]iven the probative value of this evidence, we find any prejudicial effect is outweighed." Id.
*49 In State v. Johnson, 97-1701 (La.App. 4 Cir. 5/27/98), 716 So.2d 403, this Court found that the trial court properly "granted the Prieur motion on the grounds that the similarities in the crimes were sufficient, not in their details, but because of the `extreme violence and mental attitude of antagonism and let's say anger towards females which is demonstrated in various ways, not always the same but in various ways during the course of the crimes.'" Id. at 407 (emphasis added). Thus, this Court has held that the details of prior crimes are not dispositive in determining whether evidence of those crimes is admissible. The nature of the defendant's attitude in committing prior crimes may be the critical factor in determining whether evidence of those crimes is admissible at trial.
One of the majority's reasons for holding that Mr. Rose's conviction must be reversed is that it was reversible error to admit evidence of his prior crimes, because his prior crimes and the crime for which he was tried are not "substantially similar" and that the "differences between the facts" of the two crimes are "too different." Additionally, in a footnote, the majority dismisses the matters "relating to the illegal discharge of a firearm, the battery charge upon another woman who Rose eventually married, and the running of a person off the road" as irrelevant, because they "do not fit within the Prieur framework."
I must disagree with the majority's analysis. This Court's holding in the Johnson case clarifies what determines whether evidence of prior crimes is admissible pursuant to La. C.E. 404(B)(1). There does not have to be a similarity in the specific details or facts of the crimes if the crimes demonstrate that the defendant has a particular attitude coupled with violence that is expressed in his prior crimes as well as in the crime for which he is being tried. Although Mr. Rose's prior crimes and the crime for which he was tried in the instant case are similar in their details, they each clearly express the vicious, deviant attitude that Mr. Rose holds toward women with whom he has a romantic relationship. That attitude is so similarly reflected in each of the crimes that Mr. Rose has committed that the crimes are inextricably connected in the pattern and intent they exhibit.

Mr. Rose's Prior Crimes
The prosecution introduced at the trial evidence of three crimes committed by Mr. Rose prior to the death of Ms. Rose. These crimes all involved domestic violence and were perpetrated against a woman who was or would become his wife.

Prior Crimes Against Monica Rose
The first crime introduced into evidence was an act of violence against Monica Rose, who was married to Mr. Rose prior to his marriage to Lisa Rose. Mr. Rose was initially charged with attempted second-degree murder, simple criminal damage to property, and the unauthorized use of a vehicle. Ultimately, the charge of attempted second-degree murder was reduced to the charges of aggravated assault and illegal discharge of a weapon, to which he pled guilty. He also pled guilty as charged to simple criminal damage to property in a separate proceeding.
The second crime introduced into evidence was an act of violence against Monica Rose that occurred after she and Mr. Rose were married but while they were separated. Mr. Rose called his mother and told her that he had killed Monica Rose and that he was going to kill himself. Mr. Rose's mother then called the police who went to the apartment where Mr. Rose had been living after his separation from Monica Rose. The police found Monica Rose lying on the kitchen floor covered *50 with a blanket. She had been stabbed numerous times and had bled to death. Mr. Rose fled to Biloxi, Mississippi and then to Atlanta, Georgia, where he turned himself in to the FBI. Prior to Monica Rose's stabbing, she had been arguing with Mr. Rose.
Mr. Rose was charged with second-degree murder in the death of Monica Rose, but he ultimately pled guilty to the reduced charge of manslaughter. He served approximately ten and a half years in prison for this crime.

Prior Crime Against Lisa Rose
Prior to the murder of Lisa Rose, Mr. Rose was investigated in connection with an act of domestic violence perpetrated against Lisa Rose. She and Mr. Rose had had a verbal altercation. Mr. Rose was upset, because Lisa Rose would not look him in the eye when he spoke to her. During the altercation, Mr. Rose grabbed Lisa Rose, and he struck her with his fist about her head and face and other parts of her body. The officer who investigated the incident testified at the trial of the instant case that Lisa Rose's lips were bruised, that her face was slightly swollen, and that her arms appeared to have been grabbed by someone. A photograph showing these injuries was introduced into evidence at Mr. Rose's murder trial. This incident occurred just two months prior to Lisa Rose's death by strangulation.

Relationship of the Prior Crimes to Lisa Rose's Murder
Pursuant to La. C.E. art. 404(B)(1), it is permissible to use evidence of Mr. Rose's prior crimes to show, among other things, his specific intent to murder Lisa Rose, his identity as the perpetrator of the murder, and the intentional, rather than accidental, nature Ms. Rose's death. There is a striking similarity in the pattern of crimes perpetrated against Monica Rose and those perpetrated against Lisa Rose.
All of the crimes against Rose's two wives were episodes of domestic violence, and each episode of violence against each wife showed a pattern of escalating violence. After the death of each of his wives, Mr. Rose contacted his mother, fled in an automobile to another state, and ultimately turned himself in to the authorities. In the case of Monica Rose's death, Mr. Rose fled by automobile to Atlanta, Georgia after calling his mother to report that he had killed his wife. In the case of Ms. Rose's death, he called his mother but he was unable to reach her. Mr. Rose then fled to Lake Charles, Louisiana and crossed the state line into Texas prior to presenting himself to the authorities.
After the initial prior crimes against each of his two wives, Mr. Rose and the victim reconciled. After the first incident with Monica Rose, she and Mr. Rose eventually married. Even though Mr. Rose had beaten Lisa Rose just two months prior to her death, she and Mr. Rose were together again when she was killed.
Mr. Rose's crimes of domestic violence follow a definite pattern, even though the relationships with his wives were years apart as a result of his incarceration for the death of Monica Rose. Once Mr. Rose was released on parole, however, he resumed his pattern of domestic abuse, this time against Lisa Rose, first when she was beaten, and then when she was killed.
The pattern that Rose's crimes follow clearly shows that he intended to kill Lisa Rose, because his acts of domestic violence escalated until they culminated in the death of his spouse. Although Mr. Rose denied that he had any involvement in Lisa Rose's death, evidence of his identity as the perpetrator is supported by the introduction of the evidence of his prior crimes. The pattern that he followed in his acts of domestic violence clearly assists in identifying *51 him as the person who killed Lisa Rose. Finally, his attempts to make it appear that Lisa Rose died as a result of a suicide fail once the pattern of his crimes of domestic violence is considered. The autopsy of Lisa Rose showed that her death was not accidental or the result of a suicide, as Mr. Rose had attempted to make it appear, and the pattern of Mr. Rose's crimes of domestic violence culminating in the death of his wife support the identification of Mr. Rose as the perpetrator of the death of Lisa Rose.
In using the evidence of prior crimes to show Mr. Rose's intent to murder Lisa Rose, the three requirements established by the Arrington case discussed above are met. First, Mr. Rose's crimes are clearly similar. They are all acts of violence against his wife either during courtship or after marriage. Second, at the trial there was clearly a contested issue of Mr. Rose's intent to kill Lisa, because Mr. Rose denied any involvement in the murder. Third, the probative value of the evidence outweighed its prejudicial effect. The introduction of evidence of prior crimes is always prejudicial, but in the instant case, the pattern of domestic violence Mr. Rose exhibited against his two wives is so similar that evidence of his prior crimes against both of his wives is of considerable probative value, and it outweighs the prejudicial effect of the evidence.
The following similarities in the crimes committed by Mr. Rose are clearly probative in identifying him as the perpetrator of the homicide against Lisa Rose:
1. Mr. Rose's prior crimes demonstrate that he initially resolves his anger at his wife by beating her or violently attacking her.
2. Then he resolves his anger at his wife by killing her.
3. He kills his wife by a method involving unusual cruelty and brutality and close, physical contact.
4. He contacts or attempts to contact his mother after he has killed his wife.
5. He flees the jurisdiction after he has killed his wife.
6. At the urging of his mother, he turns himself in to the authorities after he has fled.
Thus, Mr. Rose's crimes showed many similarities. Even more important, however, under this Court's holding in the Johnson case discussed above, was the "`extreme anger and mental attitude of antagonism and ... anger towards females which is demonstrated in various ways not always the same.'" 716 So.2d at 403.
I find that the evidence of the prior crimes committed by Mr. Rose were properly introduced into evidence at his trial to show his intent to murder Lisa Rose, to prove his identity as the murderer, and to prove that Lisa Rose's death was not by an intentional or accidental overdose of pills. Thus, the evidence of the prior crimes was admissible.
NOTES
[1] In State v. Cotton, 00-0850, p. 11 (La.1/29/01), 778 So.2d 569, 580, n. 3, rehg. granted in part for clarification, the Louisiana Supreme Court noted: "This Court has not yet addressed the extent [sic] to what extent [La. C.E.] Article 1104 and the burden of proof required by the federal rules, as interpreted in Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), has affected the burden of proof required for the admissibility of other crimes evidence." In State v. Jacobs, 99-0991, pp. 24-25 (La.5/15/01), 803 So.2d 933, 952, n. 15, cert. denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002), the Louisiana Supreme Court stated: "The standard for determining a defendant's connexity with the other prior crimes, i.e., by a preponderance of the evidence or by clear and convincing evidence, for purposes of determining admissibility of other crimes evidence, remains an open question in this court. See La.Code Evid. art. 1104." In State v. Galliano, 02-2849 (La.1/10/03), 839 So.2d 932, the Supreme Court again stated that it did not need to reach the issue of the burden of proof:

As to the requisite burden of proof, we noted in State v. Kennedy, XXXX-XXXX (La.4/3/01), 803 So.2d 916, 920 n. 5 that Article 1104 of the Louisiana Code of Evidence was added in 1994 to provide that "the burden of proof in a pretrial hearing held in accordance with State v. Prieur, 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404." We need not reach the issue of the applicable burden of proof in this case, because we find that the State satisfied its burden under either the clear and convincing evidence standard or the preponderance of the evidence standard.
Id., 02-2849, p. 2, 839 So.2d at 935 n. 1.
[2] The trial court had allowed the evidence of other crimes, and the defendant's writ applications to the Fifth Circuit and the Louisiana Supreme Court had been denied prior to trial, conviction. In his subsequent appeal, the appellate court revisited the issue. Id., at p. 2, 837 So.2d at 686.
[3] Similarly, we find matters relating to the illegal discharge of a firearm, the battery charge upon another woman who Rose eventually married, and the running of a person off the road do not fit within the Prieur framework to be relevant to the case at bar.
[1] State v. Fortino, 2002-708 (La.App. 5 Cir. 12/30/02), 837 So.2d 684; State v. Hamilton, 99-523 (La.App. 3 Cir. 11/3/99), 747 So.2d 164; State v. Williams, 95-0579 (La.App. 4 Cir. 4/10/96), 672 So.2d 1150.