949 So.2d 1236 (2007)
STATE of Louisiana
v.
Randy ROSE.
No. 2006-K-0402.
Supreme Court of Louisiana.
February 22, 2007.
*1237 Charles C. Foti, Jr., Attorney General, Eddie J. Jordan, Jr., District Attorney, Graham L. Bosworth, Meri M. Hartley, Assistant District Attorneys, for Applicant.
Kevin Vincent Boshea, New Orleans, for Respondent.
KIMBALL, Justice.
This case involves the issue of the admissibility of other crimes evidence in defendant's trial for the second degree murder of his wife. The trial court concluded the evidence of other crimes sought to be introduced by the State, which included defendant's previous conviction for the manslaughter of his former wife, his convictions for violence perpetrated against his former wife, and his arrest for domestic violence against his wife, were admissible. The court of appeal reversed this determination, finding the crimes were too dissimilar to be independently relevant. We conclude the evidence of other crimes is highly probative to show defendant's identity, pattern, system and motive, and his vicious attitude toward women with whom he shares a close personal relationship. We further conclude the other crimes evidence is not unduly or unfairly prejudicial and that its probative value outweighs its prejudicial effect. Accordingly, we reverse the judgment of the court of appeal and remand the case to that court for it to consider defendant's remaining assignment of error.

Procedural History
Defendant, Randy Rose, was charged by grand jury indictment on January 29, 2004, with second degree murder of his wife, Lisa James Rose, a violation of R.S. 14:30.1. He pled not guilty at his arraignment on February 3, 2004. The State filed a notice of intent to use evidence of other crimes in conformity with State v. Prieur, 277 So.2d 126 (La.1973), and La. C.E. art. *1238 404(B). The notice indicated the State intended to introduce evidence regarding the defendant's prior conviction of manslaughter of his former wife, prior physical violence involving his former wife, and prior physical violence involving the victim. A Prieur hearing was held on March 24, 2004, after which the trial court granted the State's request and ruled that the other crimes evidence was admissible to prove intent and a system or a plan. The trial court found that the probative value of the evidence outweighed its prejudicial effect. Upon defendant's application for supervisory writs, the court of appeal granted defendant's writ application, but denied relief. State v. Rose, 04-0693 (La.App. 4 Cir. 5/20/04) (unpub'd). This court subsequently denied defendant's writ application. State v. Rose, 04-1374 (La.6/16/04), 876 So.2d 788.
Defendant's trial took place on August 30 and 31, 2004. A twelve-person jury found defendant guilty as charged. The trial court denied the defendant's motion for a new trial and sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence.
On appeal, the court of appeal reversed defendant's conviction and sentence based on its finding that the trial court clearly and convincingly erred in permitting the introduction of evidence of prior crimes committed by defendant. State v. Rose, 05-0396 (La.App. 4 Cir. 1/18/06), 925 So.2d 34. The court acknowledged various similarities between the two homicides, including the facts that both involved the wife of defendant, both involved close physical contact of an especially brutal nature, both were committed in defendant's home, both occurred after a previous incident of violence by the defendant against his wife, both followed a recent separation between defendant and his wife, and both were followed by defendant fleeing the state. Id., 05-0396 at pp. 21-22, 925 So.2d at 46-7. Nevertheless, the court found that "the similarities between Ms. Rose's murder and the other crimes that [defendant] was previously charged with are not substantially similar to the crime in the case at bar." Id., 05-0396 at p. 22, 925 So.2d at 47.
This court granted certiorari to review the correctness of the court of appeal's judgment. State v. Rose, 06-0402 (La.11/9/06), 941 So.2d 28.

Facts
On November 24, 2003, Ms. Rose was found dead in her bathtub, lying nude in the fetal position with her head beneath the faucet. A number of partially dissolved white pills were observed on top of her head and on portions of her body, suggesting that the tub had been previously filled with water. No signs of forced entry to the residence existed. After an autopsy, Ms. Rose's death was classified as a homicide and the cause of death as manual strangulation. At trial, the pathologist placed the time of death as occurring approximately 10 to 18 hours before his 8:00 a.m. examination of the body on November 25, 2003.
Ms. Rose resided with defendant and her young adult children, Ashley James ("Ms.James") and Allen James ("Mr. James"). Mr. James testified that on the morning of November 24, 2003, his mother awakened him at approximately 9:00 a.m. Soon thereafter, Mr. James heard Ms. Rose and defendant, his stepfather, arguing over a traffic ticket. He noted that his stepfather was quite angry. Ms. Rose dropped Mr. James off at work at the Oakwood Mall at approximately 9:30 a.m. Ms. Rose was scheduled to attend a doctor's appointment that morning at 10:00 a.m. and had planned to pick Mr. James up from work at 4:00 p.m.
*1239 Mr. James testified that before he and Ms. Rose left their home, defendant asked Mr. James if he planned to come home between his two jobs. Mr. James told him that he did not. Mr. James testified that he felt strange after his stepfather made this particular inquiry because it was unusual that he would ask him about his whereabouts for the day. Mr. James further testified that on that morning he observed his stepfather wearing a blue skull cap and his mother wearing a brown colored sweat suit.
Ms. James testified that her mother drove her to Delgado Community College on November 24, 2005. Ms. James recollected that they left the house at approximately 8:10 a.m. Ms. James returned home between 9:45 a.m. and 10:00 a.m. to retrieve a set of keys. When she arrived home, Ms. Rose, defendant and Mr. James were still at home.[1] Ms. James then left her home and went to a friend's house. While at her friend's house, she reviewed some of her study guides and then called Richard Wilson, a close family friend with whom she maintained a relationship. Mr. Wilson, unable to take her call, put her on hold, and she eventually hung up and returned to school.
Ms. James's last class ended sometime around 1:00 p.m. She waited at school until approximately 2:00 p.m. for her boyfriend to pick her up. After he arrived, she went back to her house to drop off her books and to pick up a check. Her boyfriend stayed in the car. She related that the house looked normal at that time and that it was quiet. The lights were off except for the bathroom light, which was normally kept on, and no one appeared to be home. She did not go into the bathroom. Ms. James then went shopping at several area shopping malls. That afternoon she received a call from her brother alerting her that no one had picked him up after work and that he needed a ride to his second job. Ms. James telephoned her grandmother and arranged for her to pick up her brother.
After completing a few more errands, Ms. James called her mother's best friend and told her that she had not heard from her mother and that she had been looking for her all day. Ms. Rose's friend agreed to meet Ms. James at the family's house. The two arrived at the house at the same time. The door was locked. Once inside, Ms. James began telephoning hospitals and the police to see if anything had happened to her mother or stepfather. Ms. James observed that her stepfather's lunch for work was still in the refrigerator. She noticed that the bathroom light was still on and that the area around the sink was in disarray, which she knew would upset her mother, so she entered. At that point at approximately 8:00 p.m., she found her mother's lifeless body in the bathtub. She touched her mother's body, but could not move her because her arms and everything "were like hard, solid." She called 911.
The next morning, when Ms. James returned to the house, she was unable to locate the clothes her mother had worn the previous day. She noticed that the trash bag was missing from the kitchen garbage can. Detective Ronald Ruiz of the New Orleans Police Department came to the house to inform her of the results of the autopsy. Ms. James mentioned that her mother's clothes and the trash bag were missing. She also noted that on occasion her stepfather would take their trash to the dumpster around the corner. Shortly thereafter, Detective Ruiz telephoned Ms. *1240 James and asked if she could come to the dumpster to identify some clothing that he had recovered. She went immediately and identified her mother's underwear, bra, sweat pants and top that her mother had been wearing the previous day. She also identified the shirt her stepfather had been wearing the previous day, a pair of his socks and his blue skullcap. She also identified a towel from their bathroom and a pillow that her mother had made for her, as well as a pair of her own socks.
Richard Wilson testified that he had a close friendship with Ms. Rose for many years beginning when her children were toddlers. He stated that he had helped raise the children as if they were his own. Subsequently, Mr. Wilson married another woman and his relationship with the children became much more limited. Nevertheless, he maintained contact with them over the years. Mr. Wilson recalled that on the morning of November 24, 2003, he received a telephone call from Ms. James at work between approximately 9:45 a.m. and 10:00 a.m. He was forced to place her on hold, and when he got back to the call the two had been disconnected. Assuming she had called him from her home, Mr. Wilson then called Ms. James back and defendant answered the phone. Mr. Wilson explained to the defendant he was calling for Ms. James. Defendant became upset and refused to believe Mr. Wilson. Defendant insisted that he was calling to speak to Ms. Rose and accused him of having an affair with her. Mr. Wilson testified that in the course of the telephone conversation, the defendant made a threatening statement to the effect of, "I'm going to bring the heat." Defendant eventually ended the conversation by hanging up.
Candice Mitchell testified that on November 24, 2003, the defendant came to her house in Gretna between 2:30 p.m. and 3:00 p.m. The defendant and Ms. Mitchell spoke for a while and he asked if he could use her car to go to traffic court. Ms. Mitchell recalled that traffic court was scheduled to begin at 5:00 p.m. and defendant left her home at 4:00 p.m. The defendant was expected to return the car shortly after traffic court but he failed to do so. She reported her car missing around midnight. Early the next morning, defendant called Ms. Mitchell twice, once from Lake Charles, Louisiana, and once from Houston, Texas.
Detective Ronald Ruiz testified that on November 24, 2003, at approximately 7:45 p.m., he was dispatched to the Rose residence to investigate a possible homicide. Upon his arrival, he discovered Ms. Rose's lifeless body in the bathtub and also observed the undissolved pills on top of her head and in the tub. An autopsy subsequently revealed that Ms. Rose did not have any drugs or alcohol in her system. The pills appeared to have been scattered about her body in an attempt to stage a scene of suicide. He noted that no signs of forced entry to the residence existed. He also discovered that there was a message on the family answering machine from the Medicaid Office regarding rescheduling Ms. Rose's appointment that she apparently had missed on the day of her death. Detective Ruiz recounted finding the items identified by Ms. James as coming from the Rose household in the dumpster near their house. Detective Ruiz further recounted that although a scratch was present on defendant's hand at the time of his arrest, DNA evidence revealed blood underneath Ms. Rose's fingernail to be her own. Further, he stated that although Randy Rose's clothes found in the dumpster were tested for hair, blood and fibers, no evidence was found.
When called later by the defense, Detective Ruiz further testified that he applied for a search warrant for a blood sample *1241 from defendant. In his request for the search warrant, he stated the time of Ms. Rose's death was between 10:00 a.m. and 11:00 a.m., which was the time he had obtained from the pathologist, Dr. Liuzza.
Dr. Gerald Liuzza, a witness accepted as an expert in the field of forensic pathology, testified regarding the autopsy he performed on Ms. Rose. Dr. Liuzza classified Ms. Rose's death as a homicide caused by manual strangulation. Dr. Liuzza's examination revealed petechial hemorrhages on the victim's eyelids, which were reflective of an increase in blood pressure to the head and neck area caused by some constriction about the head and neck. A small scrape was detected on the outside of the neck, and bruising in three separate areas was present in the long slender muscles that run along the inside of the neck and near the voice box. Petechial hemorrhages were also detected on the inside of the voice box. Also, an area of hemorrhage was found along the hyoid bone above the voice box. Pulmonary edema fluid was found in the voice box. Two areas of hemorrhage were detected on the back of the head. Bruising was also detected at the base of the tongue. Dr. Liuzza opined that a significant amount of force was required to have disrupted tissues at the level that he observed. He placed the time of death as occurring approximately 10 to 18 hours before his 8:00 a.m. examination of Ms. Rose's body on November 25, 2003. Dr. Liuzza also noted the toxicology results were negative for the presence of drugs or alcohol.
Betty Rose, defendant's mother, testified that on November 24, 2003, defendant arrived at her house at approximately 10:30 a.m. and left at around 2:00 p.m. She also explained that the defendant had been living with her "on and off" for the months preceding Ms. Rose's death because the couple were arguing and Ms. Rose had placed defendant under a peace bond.
In his own defense, defendant testified he and Ms. Rose did not argue on the morning of her death, rather, they simply discussed his court hearing and the expense of paying the traffic ticket at issue. Defendant stated that he was not home when Ms. Rose returned from dropping her son at work because he left his home sometime between 10:00 a.m. and 10:15 a.m. to go to his mother's house.
Defendant acknowledged having the telephone exchange with Mr. Wilson, but denied that it was heated and that he accused Mr. Wilson of having an affair with Ms. Rose. Nevertheless, defendant acknowledged he did believe Mr. Wilson wanted to return to a relationship with Ms. Rose.
After defendant visited with his mother until approximately 1:30 p.m. or 2:00 p.m., he went to Ms. Mitchell's house and asked to borrow her car to go to court. On his way to court, he decided to skip his court hearing and, instead, drove around. As he was driving, defendant testified he was thinking about how to get the money to pay the traffic ticket the next morning. At about 7:00 p.m., he telephoned his mother. His sister answered the phone and reported to defendant that Ms. James had called and was screaming that the defendant had killed her mother. Defendant told his sister that he did not murder Ms. Rose. Defendant further testified that at this point he panicked and just started to drive. After driving to Texas, defendant collected his thoughts and realized he had no reason to run. He returned to Louisiana and turned himself in to authorities at the Fourth District Police Station in New Orleans.
Other Crimes Evidence
Homicide of Monica Young Rose. Lieutenant Curtis Snow of the Jefferson Parish *1242 Sheriff's Office testified that on November 18, 1991, a 911 dispatcher alerted him that Betty Rose (defendant's mother) had called to report her son had killed his wife and he was returning to the scene to kill himself. Lt. Snow was the first officer at the scene. After the arrival of other officers to the scene, he kicked the door of the apartment open, and after turning on the lights, observed a pair of legs protruding from behind the kitchen counter on the floor. He removed a blanket, which was partially covering the victim, and observed that the victim had sustained multiple stab wounds to the upper chest area. Lt. Snow testified that he learned that defendant and Monica Rose had separated in September of 1991. An arrest warrant was issued for defendant. After the commission of the crime, defendant had fled the area, first to Biloxi, Mississippi, and then to Atlanta, Georgia, eventually turning himself in to the FBI in Atlanta. The defendant was charged with second degree murder and ultimately pled guilty to the lesser offense of manslaughter. At the time of Ms. Rose's murder, defendant was on parole from his manslaughter sentence. A certified copy of the conviction was introduced at trial.
Defendant admitted he killed his first wife. Defendant acknowledged that his marriage to Monica Rose began breaking up a few months after they were married. At the time she was killed, she had moved out of the house and defendant had found his own apartment. On the night of her homicide, Monica Rose brought defendant some groceries. Defendant explained that he had worked almost 30 hours straight without any sleep and that, at the time, he felt he was in danger because his wife had previously threatened his life. He testified they began to argue, she reached for a kitchen knife, they struggled over the knife, and she ended up dead. Defendant denied stabbing Monica Rose 18 times, stating that it was only three.
Violence Involving Monica Young Rose. Defendant was convicted of unauthorized use of a movable, illegal use of a firearm and aggravated assault in 1990 after he fired several shots into the car owned by Monica Young Rose, then his fiancee. The State introduced a certified copy of these convictions. Regarding this incident, defendant stated he began carrying a firearm after Monica Young Rose's family threatened him. He stated that he was driving and saw her driving her car. She presented what looked to him like a firearm, and he discharged his weapon. Defendant denied running her off the road and hitting her car, claiming that her car veered into the car he was driving. His car, which he had borrowed, was inoperable and he took her car after she ran inside the residence where she worked because he was scared and needed to go some place where he could calm down. After talking to his mother that same day, they decided defendant would turn himself in to the police.
Violence Involving Lisa James Rose. Ms. Rose called the authorities in August 2003 after the defendant allegedly struck her. Officer Tindell Murdock testified that on August 25, 2003, he responded to a complaint of domestic violence at the home of defendant and Ms. Rose. He was met by Ms. Rose who informed him that she had been involved in a verbal argument with her husband that morning at approximately 9:00 a.m. Ms. Rose stated defendant had become angry because she did not want to look at him as he talked to her. She related that defendant then grabbed her by the head and forced her to look at him. When she attempted to pull away he began striking her with his fist about the head, face and body. Officer Murdock observed that Ms. Rose's upper and lower lips were bruised and that she had minor swelling to *1243 her face and arms. He also noticed bruising on both of her arms. Officer Murdock completed the incident report and sent out a bulletin for defendant's arrest on the charge of acts of domestic violence, to wit: battery.[2] The State introduced a photograph of Ms. Rose's injuries into evidence.
Defendant explained that the injuries depicted in the photograph of Ms. Rose were not caused by his beating her but by his holding her. He stated they were having an argument, she started to swing at him, and he held her down. He acknowledged that she put a peace bond on him. He stated that soon thereafter she began to call him at his mother's house because she wanted to see him and that when they went to court she withdrew the battery charge.

Discussion
The State contends the court of appeal erred in finding that the other crimes evidence was improperly admitted into evidence and in consequently reversing defendant's conviction. The State argues that the other crimes evidence was admissible as it showed an established history and pattern of spousal abuse and eventual uxoricide committed by defendant, which demonstrated intent, motive, identity and modus operandi.
It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); State v. Williams, 96-1023, p. 30 (La.1/21/98), 708 So.2d 703, 725; State v. Prieur, 277 So.2d 126, 128 (La.1973). Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." Prieur, 277 So.2d at 128. However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. Prieur, 277 So.2d at 130. Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. State v. Martin, 377 So.2d 259, 263 (La.1979); Prieur, 277 So.2d at 130. The State also bears the burden of proving that defendant committed the other crimes, wrongs or acts.[3]State v. Galliano, 2002-2849, p. 2, (La.1/10/03), 839 So.2d 932, 933 (per curiam).
Although a defendant's prior bad acts may be relevant and otherwise admissible *1244 under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. State v. Germain, 433 So.2d 110, 118 (La. 1983). As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)("The term `unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").
There is no dispute that the State provided defendant reasonable notice and that a Prieur hearing was held. We find the State proved defendant committed the other crimes, wrongs or acts by clear and convincing evidence.[4] Defendant was convicted of manslaughter and of the prior crimes committed against Monica Young Rose. The case against defendant for municipal domestic battery against Ms. Rose was not resolved at the time of Ms. Rose's murder. At trial, defendant gave his version of the facts surrounding each of the other crimes or wrongs introduced and did not deny he was the same person involved in the incidents at issue.
In the instant case, the identity of the perpetrator was at issue and the task before the trial court in determining the relevance of the prior homicide was not "merely pigeonholing, but of classifying and then balancing." 1 McCORMICK ON EVIDENCE, p. 672 (5th ed., 1999, John W. Strong, ed.). The identity of the perpetrator was a material issue at trial because defendant claimed he did not kill Ms. Rose, not that he killed her accidently or in the heat of passion. This court has allowed the use of other crimes evidence to show modus operandi or system as it bears on the question of identity when the prior crime is so distinctively similar to the one charged, especially in terms of time, place and manner of commission, that one may reasonably infer that the same person is the perpetrator in both instances. State v. Hills, 99-1750, p. 6 (La.5/16/00), 761 So.2d 516, 521; State v. Moore, 440 So.2d 134, 137 (La.1983). "[T]o assure that modus operandi evidence involving crimes or acts similar to the charged offense does not become a passkey to the introduction of the character and propensity evidence that La.C.E. art. 404(B) prohibits, this court has `closely analyze[d] the . . . transactions in order to determine whether they . . . exhibit such peculiar modes of operations to distinguish them as the work of one person.'" Hills, 99-1750 at pp. 6-7, 761 at 521 (quoting State v. Gaines, 340 So.2d 1294, 1297 (La.1976)). The assessment of this standard is fundamentally a balancing process. Moore, 440 So.2d at 137. As we explained in Moore, "[t]he greater the degree of similarity of the offenses, the more the evidence enhances the probability that the same person was the perpetrator, and hence the greater the evidence's probative value, which is to be ultimately weighed against its prejudicial effect." Id. at 137-38.
As explained above, evidence of other crimes, wrongs or acts may also be introduced to establish proof of motive. For evidence of motive to be independently relevant, it must be factually peculiar to the victim and the charged crime. State v. Lafleur, 398 So.2d 1074, 1080 (La.1981). Additionally, in a case in which the State *1245 sought to elicit testimony as to defendant's motive, this court observed, "Clearly, evidence that defendant and his ex-wife, the person to whom defendant's alleged criminal conduct was directed, had had a poor marital relationship and that defendant had a bad temper was relevant as tending to show the commission of the offense. . . ." State v. Walker, 394 So.2d 1181, 1184 (La.1981). See also State v. Welch, 615 So.2d 300, 303 (La.1993)("[T]he state could not place the circumstances of the offense in their proper context without reference to the nature of the relationship existing between the victim and the defendant. . . . The primary purpose of the evidence [of prior acts of violence or threats of violence] was not to prove Welch's bad character but to illustrate the volatile nature of his relationship with the victim. . . . ").
In the instant case, we find the evidence that defendant physically abused Ms. Rose is independently relevant to show the volatile nature of the relationship between defendant and Ms. Rose. This evidence tends to show defendant's motive for commission of Ms. Rose's murder. The State was attempting to prove that defendant was the perpetrator of Ms. Rose's violent death. The State's case was largely dependent on circumstantial evidence, so any evidence tending to prove that defendant had a motive or reason for committing the murder was extremely probative. See Lafleur, 398 So.2d at 1081. Defendant's documented physical abuse of Ms. Rose illustrates a motive factually peculiar to her murder.
In the present case, the following evidence clearly supports the State's contention that the defendant was the perpetrator of his Ms. Rose's murder: (1) both victims were married to the defendant at the time of their deaths; (2) both victims had a stormy marriage resulting in periods of living separate and apart from defendant; (3) both victims had been the recipient of violence inflicted by the defendant before their deaths; (4) both homicides involved close physical contact of a brutal nature; (5) both homicides were committed in defendant's home; (6) after the homicides of both victims, the defendant contacted or attempted to contact his mother and fled the state in an automobile; (7) each homicide and incident at issue ended in defendant turning himself in to the authorities. The similar nature of these crimes clearly demonstrates an identifiable, concrete, relevant pattern of behavior of the defendant that is so distinctively similar that one may logically infer that the same person committed both crimes. We therefore disagree with the court of appeal's determination that the other crimes evidence and Ms. Rose's murder are not substantially similar enough to allow their introduction.
While we recognize there are clearly differences among the crimes or acts at issue, we find that, taken as a whole, the similarities are sufficiently probative as to defendant's identity as Ms. Rose's murderer. Additionally, we acknowledge that the two homicides occurred some 12 years apart; however, much of that time span included the period of time defendant was incarcerated for the manslaughter of Monica Rose. In both instances, defendant's wives were killed soon after they were married to defendant after circumstances revealed increasing violence in their relationships with defendant. We agree with Judge Cannizzaro's observation in his dissent to the court of appeal's judgment that despite some clear dissimilarities in the details of the homicide and violence inflicted upon Ms. Rose and the homicide and violence involving the defendant's prior wife, the crimes "clearly express the vicious, deviant attitude that [defendant] *1246 holds toward women with whom he has a romantic relationship. This attitude is so similarly reflected in each of the crimes that [defendant] has committed that crimes are inextricably connected in the pattern . . . they exhibit." Rose, 05-0396 at p. 4, 925 So.2d at 49 (Cannizarro, J., dissenting).
Thus, the evidence of the prior crimes was relevant not because it revealed defendant's general criminal propensities or his propensity for violence as it specifically related to women (both uses prohibited by La.C.E. art. 404(B)), but because when considered together, the crimes revealed sufficient similarities arising from a fixed and aberrant pattern of behavior that tended to identify defendant as the perpetrator in the death of his second wife. The other crimes evidence was extremely probative, especially considering the circumstantial nature of the case against defendant. The prior crimes evidence tended to corroborate the remaining evidence introduced at trial. For example, the jurors heard from Mr. James that Ms. Rose and defendant were arguing on the morning of her death over a traffic ticket. They also heard from Mr. Wilson that he and defendant had engaged in a heated telephone conversation on the morning of her death in which defendant accused Mr. Wilson of having an affair with Ms. Rose. The other crimes evidence showed defendant had previously grabbed and struck Ms. Rose during another argument when defendant accused her of not looking at him when he spoke to her. The other crimes evidence also showed defendant acted violently toward another woman with whom he had a close personal relationship, and eventually killed her during an argument. Thus, rational jurors could have found the similarities sufficiently probative to identify defendant as Ms. Rose's murderer because a specific pattern of violent and obsessive behavior earmarked the crimes as the work of one man and thereby "sustain[ed] the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." Old Chief, 519 U.S. at 187, 117 S.Ct. at 653.
When the probative value of the other crimes evidence is balanced against its prejudicial effect, we find the evidence was properly admitted because it was not unduly or unfairly prejudicial. While the evidence that defendant had killed his first wife after acting violently towards her and that he had physically abused Ms. Rose was clearly prejudicial in his trial for the murder of Ms. Rose, it was highly probative to show defendant's identity, pattern, system and motive. We do not believe the prejudicial effect of the other crimes evidence rises to the level of undue or unfair prejudice when it is balanced against its probative value. Defendant's arguments to the contrary are without merit. Consequently, the trial court correctly admitted the other crimes evidence at issue.

Decree
For the above reasons, we conclude the trial court did not err in admitting the other crimes evidence at issue. The court of appeal's judgment that the crimes were too dissimilar to be properly introduced under La. C.E. art. 404(B) and Prieur is in error. Accordingly, the judgment of the court of appeal is reversed and defendant's conviction and sentence are reinstated. The matter is remanded to the court of appeal for it to consider defendant's remaining assignment of error that was pretermitted on appeal.
Reversed and Remanded.
NOTES
[1] This testimony is inconsistent with that of her brother's testimony which indicated that he and his mother had left the house and arrived at Oakwood Mall at approximately 9:30 a.m. The jury heard the testimony of both Ms. James and Mr. James.
[2] At the Prieur hearing, it was revealed that defendant was arrested in conjunction with this incident when he turned himself in to the authorities.
[3] La. C.E. art. 1104 states:

The burden of proof in a pretrial hearing held in accordance with State v. Prieur, 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404.
This court has not yet addressed the extent to which Article 1104 and the burden of proof required by the federal rules, as interpreted in Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), has affected the burden of proof required for the admissibility of other crimes evidence. State v. Jacobs, 99-0991, p. 26 n. 15 (La.5/15/01), 803 So.2d 933, 952 n. 15; State v. Cotton, 00-0850, p. 11 n. 3 (La.1/29/01), 778 So.2d 569, 578 n. 3. In the instant case, we need not reach the issue of the applicable burden of proof because we find that the State satisfied its burden under either the clear and convincing evidence standard or the preponderance of the evidence standard.
[4] See footnote 2.