MAX N. TOBIAS, JR., Judge.
11 Jimmie Spratt, the defendant, appeals his convictions and sentences for three counts of aggravated rape and three *742 counts of aggravated kidnapping. For the reasons that follow, we affirm.
I.
On 19 November 2010, Jimmie Spratt (“Spratt”) was indicted for three counts of aggravated rape, violations of La. R.S. 14:42, and three counts of aggravated kidnapping in violation of La. R.S. 14:44. He was charged as follows: count one, aggravated rape of D.K.[1]; count two, aggravated kidnapping of D.K.; count three, aggravated rape of S.M.; count four, aggravated kidnapping of S.M.; count five, aggravated rape of M.L.; and count six, aggravated kidnapping of M.L.
Spratt entered pleas of not guilty to all counts at his 10 December 2010 arraignment. After a hearing on 81 March 2011, the trial court denied his motion to suppress evidence. On 21 April 2011, the State filed a Prieur notice[2] and the trial court conducted a Prieur hearing on 19 May 2011; the court determined that the evidence was admissible. Following a four-day jury trial, Spratt was found guilty as charged on all counts.
12At his sentencing, Spratt filed a motion for new trial. The trial court denied the motion, and the defendant waived sentencing delays. The trial court sentenced him on each count to life imprisonment without benefit of probation, parole, or suspension of sentence, ordering that the sentences on counts one and two were concurrent to each other but consecutive to counts three, four, five, and six. Sentences on counts three and four were ordered concurrent to each other but consecutive to counts one, two, five, and six. Sentences on counts five and six were ordered concurrent to each other but consecutive to counts one, two, three, and four.
An out-of-time appeal was granted on 18 May 2012.
II.
THE EVIDENCE

Testimony of Retired Officer Harris

Christopher Harris, a retired New Orleans police officer, testified that he was an investigator with the Rape Division of the New Orleans Police Department (“NOPD”) for 22 years. On 4 July 1994, he was assigned to the Sex Crimes Unit. On that date, he was dispatched to 5700 Crowder Boulevard in New Orleans to investigate an incident of aggravated rape. When he arrived on the scene, he spoke with the first responding police officer and the -victim, D.K., who informed that she had been raped. The victim was extremely upset and afraid. She described the perpetrator as African-American, approximately five feet, nine inches tall and weighing 150 pounds. The suspect had short black hair and wore a blue shirt with an orange emblem on it, white shorts with blue pinstripes, and black tennis shoes. The victim took the officer to the location where the incident took place. The victim indicated that she had been abducted from the Hibernia National Bank | ¡¡(“Hibernia”) on the 1-10 Service Road, near Crowder Boulevard. The perpetrator had her drive to Old Gentilly Boulevard and park in the rear of the Acme Brick Company. The perpetrator robbed her of the $50 she had gotten from the ATM machine, forced her from the car, and pushed her against the wall of the building. He removed her clothes off and forced her to lie on the ground, whereupon he raped her. He then told her to get dressed, and they got back into her car. The perpetrator or *743 dered her to drive back the way they came. When they reached Dwyer Road, he told her to stop, and he got of the car. He told her to keep driving straight. She did not see which way he ran off. The victim then returned to the bank because her debit card had been left in the ATM machine. The victim then went to the Real Superstore, located at 5700 Crowder Boulevard, and an employee there helped her and called the police and the victim’s parents. The victim and her parents went to the hospital. The officer stated that he went to the Acme Brick Company and had the crime lab process the scene. A sexual assault kit was performed at the hospital. Mr. Harris testified that he contacted Hibernia and obtained a surveillance video. The video shows the perpetrator approaching the victim with a knife while the victim was getting money from the ATM machine. The perpetrator got into the back of the victim’s car.

Testimony of the Victim, D.K.

D.K. testified that on 4 July 1994, she was living at home with her parents. She had spent the day at home, and later that evening, some friends called and invited her to a party in Biloxi, Mississippi. She stated that it was not unusual for her to drive to Biloxi. She drove there once or twice a week because she taught a dance class there. D.K. asked her mother for her debit card because she realized she did not have any money on her. As she was driving on 1-610 she saw the|4Hibernia on the service road and decided use its ATM machine to obtain some cash. She did not know her way around that bank and entered through the exit lane. She was parked such that she had to lean over the front passenger seat to reach the ATM machine. The doors of her car were locked. She took out $50 and had the money in her hand when she saw a knife being shoved in the window at her throat. The perpetrator reached in and unlocked the back door. He got into the back seat and then climbed over to the front passenger seat. The perpetrator told her not to look at him, but just drive. She started crying, and he told her to shut up. He kept hitting the radio because she had country music on and he was trying to change it. He cursed about it and kept moving the seat back and forth. He was very angry. The perpetrator gave her directions on where to go, and they ended up at the Acme Brick Company. He told her to park in a gravel area behind the building. The perpetrator yelled at her to get out of the car. She complied, and she asked him not to hurt her. The victim testified that she had a debilitating neck injury as a teenager and numerous surgeries. The perpetrator pushed her against a wall and told her to shut up. He pulled her ponytail, and she screamed. He unzipped her dress and forced her to the ground. He removed her pantyhose and underwear, and raped her. When he was finished, he' yelled at her to get up and get dressed. Once she was dressed, they got back in to the car. He was yelling directions at her. At some point, he had her stop the car. He got out of the car and ran away.
D.K. then drove back to the bank because her debit card had been left in the machine. When she arrived, there was a security guard on duty. She told him that she had been raped. The security guard looked at her, got into his truck and drove off. She then drove the Superstore, which was next to the bank. One of the | semployees helped her and called the police and her parents. Her parents arrived first, and the police arrived shortly thereafter. She took Detective Harris to the scene of the incident, and then went to the hospital, where the physician examined her and conducted a rape kit. The next day she went to the police station to work with a sketch artist. D.K. described the perpe *744 trator as having very short hair and wearing blue jean shorts and a tee shirt with a sports emblem on it. At trial, she identified the defendant as the person who raped and kidnapped her.

Testimony of Michael Cure

In July 1994, Michael Cure was working as an overnight stock clerk at the Real Superstore on Crowder Boulevard. At the time of trial, he was a NOPD officer. Officer Cure testified that on 4 July 1994, he arrived at work between 11:00 p.m. and 11:30 p.m. At that time of the night, the store was closed and locked. While he was working, he saw a vehicle pull into the parking lot, and a female exited the vehicle and approached the front of the store. He told her that the store was closed. She told him that she had been raped. Officer Cure testified that the woman appeared to be very traumatized. He took her into the store and called the police and her parents. He was present when her parents and the police arrived. He spoke with the police.

Testimony of Sergeant Michelle Woodfork

Sergeant Michelle Woodfork testified that on 21 August 1994, she came into contact with Spratt, and he provided her with his address, 6800 Willow Lane, which is an apartment complex near I — 10. She prepared a report as a result of her coming into contact with him. The report gave the address of contact as 8181 Lake Forest Boulevard. The officer noted that there was a Hibernia branch next to the apartment complex.
| ¿Testimony of Dr. Antonio Muniz
Dr. Antonio Muniz testified that he was the chief resident of emergency medicine at Charity Hospital on 4 July 1994. He examined D.K. and performed the rape kit. She told him about the rape. He noted that she had abrasions on her back.

Testimony of S.M.

S.M. testified that on 19 September 1994, she was interviewing for jobs and visiting friends in New Orleans. On that day, she had dinner with her nephew and was returning to her friends’ home on General Pershing Street, where she was staying. She had parked her vehicle and was walking towards the house when she saw an unknown African-American male walking towards her. He walked past her, turned around, and grabbed her from behind. He put something to her throat. The object was cold and metal; she thought it was a knife. The perpetrator told her not to say anything. They walked back towards her vehicle. He took her into some bushes near the intersection of Loyola Avenue and General Pershing Street. The perpetrator told her to lie down. He told her not to speak or he would kill her. He pulled down her pants and underwear and raped her. He told her not to look at him. Afterwards, he told her to flip over on her stomach and keep her head down. He took her purse and left. S.M. stated that she remained in the bushes until she heard a car passing. When she got up, she heard voices coming from a house on Loyola Avenue. She ran to the house and told the residents that she had been raped. They called the police for her. When the police arrived, she spoke with them. She was taken to the hospital, where a rape kit was performed. The next day, she took photographs of the areas where the raped occurred.

_|tTestimony of Anna Marie Firkaly

Anna Marie Firkaly testified that on 19 September 1994, S.M. was staying with her at her residence on General Pershing Street. Late in the evening on that day, she received a phone call from S.M. telling her that she had been raped and that she was around the corner. S.M. was barely able to speak. Ms. Firkaly stated that she *745 got some clothes for S.M. and went to meet her around the corner. S.M. was crying and upset. She stayed with S.M. and went with her to the hospital. Ms. Firkaly stated that she later found S.M.’s purse in the area.

Testimony of Dr. Richard Ay cock

Dr. Richard Aycock was an emergency room physician at Charity Hospital in September 1994. He performed a rape kit on S.M. He testified that S.M. was withdrawn and crying. She had four — one inch abrasions on her neck. He stated that S.M. told her that a knife had been placed against her throat and she had been raped.

Testimony of M.L.

M.L. testified that in December 1994, she was a student at St. Martin’s Episcopal School. On 26 December 1994, she was hanging out with a friend, Kimberly, at a coffee shop. Kimberly decided to go home so M.L. drove to Metairie and dropped Kimberly off at her house. M.L. stated that she was returning home when she remembered she had a Christmas gift check that she wanted to deposit. She decided to stop at the ATM at the bank on corner of South Carrollton Avenue and Plum Street. She pulled up to the ATM machine. She was filling out the deposit form when she felt something being sprayed in her face. She saw that someone was getting into her car. The perpetrator opened the car door, pushed her across to the passenger side of the vehicle, and told her to get on the | ¡¡floor. She could tell it was a man, but that was all she could see. She was blinded and having trouble breathing from the spray. She asked him to let her go. He told her to shut up or he would spray her again. She could not tell where he was driving because her face was buried in the car seat. She could feel tracks and assumed they were streetcar tracks. He took her to two separate locations where he raped her. When he was driving from the bank to the first location, he made a wrong turn. She heard him curse and remark that he made a wrong turn. There was a big building with a corrugated metal roof at the first location. He walked her to a gravel area and told her to take off her pants. He had her lie down, and raped her. She noted that his face was scratchy and oily. He had her put her clothes back on and put her in the car. They drove for a longer period of time. When they arrived at the second location, he put his arm around her neck and led her to the backyard of a house. He sprayed mace in her face again, took off her clothes, and raped her. They returned to the car and continued driving. He pulled into some sort of driveway and parked the car. He took $70 from her wallet, her cell phone, and her keys. He then sprayed her with mace again and left. She sat there for a few minutes, trying to open her eyes and looking to see where she had been left. When she realized where she was, she remembered that there was Kinko’s on the corner of Carrollton Avenue. She ran to the Kin-ko’s store and knocked on the window. An employee let her in the store and called the police. She called her parents and Kimberly. When the police arrived, she spoke with them and showed them where her car was located. She was taken to the hospital where she received treatment for her injuries, and a rape kit was performed.
| ^Testimony of Kimberly Holland
Kimberly Hollard testified that on 26 December 1994, she and M.L. were hanging out at a coffee shop. She was tired so M.L. drove her home. She stated that she was getting ready for bed when M.L. called and told her that she had been raped. When Kimberly arrived at Kin-ko’s, the police were on the scene. Kimberly stated that when she arrived, M.L. *746 was frantic. She stayed with M.L. and went to the hospital with her.

Testimony of Detective Allen Gressett

Detective Allen Gressett, who is currently a federal court security officer, stated that in September 1994, he was a NOPD detective assigned to the Sex Crimes Unit. On 19 September 1994, he responded to a rape complaint in the 4200 block of Loyola Avenue. When he arrived on the scene, he spoke with the original responding officer and then spoke with the victim, S.M. After he was informed of where the rape occurred, he called the crime lab to have photographs taken of the scene. The detective testified that he searched for witnesses, but found none. The victim was taken to Charity Hospital, where a rape kit was performed. The victim gave the officer an account of what happened. She stated that she had parked her vehicle down the street from her friend’s house. She exited her vehicle and was walking to the residence when she was approached by an unknown African-American male. The man walked past her, turned around, and grabbed her by the throat. He had an object to her throat, which she believed was a knife. The perpetrator dragged her into some nearby bushes and raped her.
Detective Gressett also participated in the investigation of M.B.’s rape that occurred on 26 December 1994. He met the victim at a Kinko’s Copy Center. The victim was being assisted by a Kinko employee. The detective spoke with the |invictim, who stated that she was in her vehicle at an ATM machine at a Whitney National Bank (“Whitney”) on Carrollton Avenue when an unknown African-American male came up to her. The perpetrator sprayed mace in her face and forced his way into her vehicle. He drove her to two different locations where he raped her. He put her back in the car and drove to a McKenzie Bakery shop, where he left her. He fled on foot, taking her keys, money, and cell phone. The detective took the victim to the hospital where a rape kit was performed. Detective Gressett contacted Whitney and obtained photos and video from the surveillance cameras. He contacted the crime lab to process the scene and the victim’s vehicle. He obtained the victim’s cell phone records, which revealed that a police officer, Charles Ellis, had the cell phone. When questioned, Officer Ellis stated that he had obtained the cell phone from his apartment complex manager.

Testimony of Dorilyn Kahn

Dorilyn Kahn testified that she was the apartment manager of Carrington Park Apartments in December 1994. During that time, one of the ground porters found a cell phone in bushes near the complex parking lot. The porter gave it to the maintenance supervisor, Jim Washington, who gave the cell phone to her. Ms. Kahn stated that she gave the phone to Charles Ellis, a police officer who lived in the apartment complex, so he could turn it in to the police department. She never saw the phone again. A few days later, two police detectives came to her office, asking about the phone. Her impression was that they thought Ellis was involved in a crime.

Testimony of Dr. Anna Woeckener

Dr. Anna Woeckener was an emergency room physician at Charity Hospital in December 1994. She performed a rape kit on M.L. on 26 December 1994, |t1 explaining that the victim was very quiet and tearful. The victim told her that the perpetrator had sprayed mace in her face and raped her twice. Dr. Woeckener testified that some medium edema was present in the vaginal area of the victim as well as redness and some swelling.

Testimony of Patsy Daniels

Patsy Daniels was a forensic serologist with the New Orleans Parish Coroner’s *747 Office until 2000, having worked there for almost fifty years. Ms. Daniels testified that she conducted tests on M.L.’s rape kit. The vaginal swabs were positive for seminal fluid, and the vaginal smears were positive for spermatozoa. She also conducted tests on D.K’s rape kit. The vaginal swabs were positive for seminal fluid, and the vaginal smears were positive for spermatozoa. The tests also indicated that the perpetrator’s blood type was “0.”

Testimony of Michael Bossetta

Sergeant Michael Bossetta, presently a retired police officer, was assigned to the Sex Crimes Unit of the NOPD. Prior to retirement, he handled several cold cases, including M.L.’s rape case. Initially, two police officers, Charles Ellis and Abreace Daniels, were suspects. Officer Ellis was excluded by a lineup. Sergeant Bossetta testified that DNA testing was not available in 1994. When he learned that semen samples had been taken at the hospital, he requested that the samples be tested for DNA. The sergeant also requested that a buccal swap from Abreace Daniels be tested. The test results excluded Officer Daniels as the donor of the semen. The DNA from the rape kit was placed in CODIS. The sergeant was informed that a match had been made from CODIS. The match was confirmed and determined to be that of Spratt. His DNA was also determined to match the DNA from D.K’s rape kit. Sergeant Bossetta obtained an arrest warrant for Spratt.

11i;Testimony of Anne Montgomery

Anne Montgomery, an expert in forensic DNA analysis and molecular biology, testified that in 2008 she was the technical leader for the New Orleans DNA Laboratory connected with the NOPD Crime Lab. She identified the reports from testing of the DNA found in the D.K. and M.L. rape kits. She stated that the samples were collected in 1994 and tested after 2000.

Testimony of Gina Pineda

Gina Pineda, an expert on DNA analysis, testified that in 2005, she was the technical leader and assistant lab director for Reliagene Technologies in New Orleans. She identified the documents and reports from Reliagene concerning the DNA testing of the samples taken from the rape kits.

Testimony of Detective Step hen Brunelle

Stephen Brunelle was a detective with the NOPD sex crimes unit in July 2005. On 12 July 2005, he received information from CODIS regarding a DNA match in the S.M. case. He was informed that CO-DIS had matched several cases that were on file and identified the match as Spratt, who was, at that time, incarcerated in Memphis, Tennessee. Detective Brunelle spoke with the victim, who recounted the details of incident. S.M. stated that she did not know anyone by the name of Jimmie Spratt and wanted to pursue charges. He prepared an arrest warrant for Spratt and sent it to the Tennessee Department of Corrections to put a hold on him.

Testimony of A. J.

A.J. testified that on 9 December 1996, she was living in Memphis, Tennessee. She worked at fitness center called “Inside Out Life Gym.” A.J. stated that she was working at the fitness center on 9 December 1996. That morning, |13Spratt came into the fitness center and inquired about the gym and memberships. She gave him a tour of the facility. He indicated that it was a nice place, but too expensive. He returned a while later and said he wanted to join the gym. She looked for membership forms but did not find any downstairs. She went upstairs to look for the forms and Spratt followed her. When she went to the front desk, he came behind her and pulled her into a classroom. Spratt had his hand over her mouth. He told her he *748 wanted the cash in the register, but the register was empty. He pushed her to the floor and tried to take her clothes off. However, she had a lot of clothes on. The phone started ringing. Spratt tried to push her out of the back door. When the phone continued to ring, he left. She called the police and the owners of the gym. She identified Spratt in physical and photographic lineups as the perpetrator. She also identified him at trial. Spratt was convicted and sentenced to ten years in jail for the assault.

Testimony of K.T.

K.T. testified that she was living in Memphis, Tennessee in August 1996. At approximately 9:30 a.m. on 26 August 1996, she took her infant son for a walk. She was gone from her home about 45 minutes. When she returned home, she left her son in the living room in his stroller because he was sleeping. She went into the kitchen to get a glass of water. When she turned around, Spratt was standing in her kitchen. He asked her for directions. As she moved away, he grabbed her and started to attack her. He sprayed mace in her face and beat her in the head. She asked him to consider her like his mother or daughter or someone he cared about. She begged him not to harm her son. He continued to beat her, and she began to lose consciousness. He pushed her on the ground, removed her pants, and raped her. Afterwards, he left. K.T. stated that by this time, her son was screaming. She |14went to care for him and called the police and her husband. The police and her husband arrived at the same time. She identified Spratt in physical lineup as the person who raped her. She also identified him at the present trial.

Testimony of J.Z.

J.Z. testified the she lived in Memphis, Tennessee from 1993 to 1997, then a student at the University of Memphis. On 28 October 1996, she had classes in both the morning and early afternoon. After classes were over, she walked back to her apartment. As she walked home, she noticed a man, later identified as Spratt, passing her on the street. When she arrived home, she started cooking dinner. She heard a knock at the front door. When she opened it, the same man she had seen earlier on the street was there. Spratt asked if he could use her telephone because he had car problems. She allowed him to come in and use it. She returned to the kitchen. She walked into the living room when she heard him hang up the phone. As she walked to let him out of the apartment, he pushed back into the apartment and into the bedroom, where he raped her. Spratt had a pencil in his hand, and he threatened her with it. He pushed her onto the floor of her bedroom, removed her clothes, put her jeans over her face, and raped her. He told her to stay there. He went over to the other side of the bed and heard him pull on something. Afterwards, Spratt left. When J.Z. heard the perpetrator leave the apartment, she got up and went to call the police. She saw that he had ripped the phone from the wall. She went out to the living room and found that the perpetrator had ripped out that phone as well. J.Z. took the phone connection from her computer, plugged the connection into her phone and called the police. When the police arrived, she gave them a statement about the incident. She then went to the hospital for an | ^examination. She identified Spratt in a photographic lineup. He pled guilty to her assault. J.Z. identified Spratt at the present trial.

Testimony of R.S.

R.S. testified that she lived in Memphis, Tennessee in November 1996. On 5 November 1996, she was at home planning dinner for her and her children. She real *749 ized that she needed a few items for supper. She put her dog in the bedroom and shut the front door. She did not lock her front door because she always felt safe in the neighborhood. Her neighbors did not lock their doors. The apartment complex, where she lived in a second floor apartment, was not gated; it was three blocks from the university campus, and people were always walking in the neighborhood. She walked to the grocery, purchased a few items, and returned home. After entering her home, she walked towards the sofa, intending to put the groceries there. At that point, someone put a pillowcase over her head and a knife to her throat. She heard a man’s voice say not to scream or he would cut her. She realized that her children would be home from school soon, and she began to worry about them. Her dog was growling and barking. She could hear her dog trying to dig out of the door. The man twisted the pillowcase tighter around her neck and pushed her to the ground. He told her not to scream, for if she did, he would hurt her. He made her pull down her pants, and he raped her. Afterwards, he told her to stay there and not take the pillowcase off. He said that if she did not comply, he would come back and hurt her. She heard him leave and shut the door. She jumped up and ran after him. She followed him down the stairs, yelling that he raped her. Her neighbors came outside to help her. The perpetrator turned around, smiled, and waved at her. She watched him leave in a car. The neighbors called the police. When the police arrived, she gave them a statement and was taken to 11fithe hospital. She identified Spratt in physical and photographic lineups as the person who raped her. She also identified him at the present trial.

Testimony of S.W.

S.W. testified that she lived in Memphis, Tennessee in December 1996. On 26 December 1996, she was working for the National Multiple Sclerosis Society. She arrived at work between 8:00 a.m. and 8:30 a.m. She unlocked the door, turned on the lights, opened the office, and was the only person in the office at that time. Not long after she arrived, a young man, later identified as Spratt, came in and asked questions about what they did and if anyone else was in the office. She explained what the organization did, including finding doctors for people with multiple sclerosis. Spratt asked about a particular doctor. She stated that she did not know the doctor. As she reached down to get a phone book, he hit her on the head with a glass bottle. She fell to the ground and lost consciousness. She remembers him dragging her by her hair down a hallway. When she woke up, he was on top of her. She passed out again. When she awoke again, he had taken her pants off and was raping her. Afterwards, he left. Her face and hair were covered in blood. She could not see well because blood was in her eyes. She called the police. When the police arrived, she was taken to the hospital where a sexual assault exam was performed.

Testimony of Jennifer Schroeder

Jennifer Schroeder, an expert in the field of forensic DNA and molecular biology, testified that she worked for Reliagene Technologies in 2003 as a DNA analyst. Later, she worked for the NOPD as a DNA analyst until 2010. On 3 November 2004, she received a CODIS hit relative to Spratt. It was preliminary match notification from Tennessee. She sent correspondence to the investigating 117detectives about this information. She also sent correspondence to Tennessee to confirm the match. She then got another CODIS match relative to Spratt, and informed the detectives about the second match. She also received correspondence from the *750 Tennessee confirming the match. Shortly thereafter, she received notification of a third match.

Testimony of Constance Howard

Constance Howard, an expert in DNA forensic analysis, was a forensic agent with the Tennessee Bureau of Investigation Crime Lab in Memphis. She identified the reports from the sexual assault kit performed on J.Z. The DNA from J.Z.’s sexual assault kit matched Spratt. After some time, she received information from CODIS that one of the samples from J.Z.’s kit matched some samples from New Orleans. Jennifer Schroeder contacted her and asked her to verify the matches. Ms. Howard sent correspondence to Ms. Schroeder confirming the matches with the offender’s identifying information.

Testimony of Jim O’Hem

Detective Jim O’Hern testified that, after learning of the three CODIS matches and that Spratt was incarcerated in Tennessee, he went to Tennessee, where he obtained a search warrant to get a buccal swap from Spratt. After obtaining the buccal swab, he returned to New Orleans and had the swab processed by the Louisiana State Police Lab. The detective also obtained photographs of Spratt at the time of his arrest in Memphis.

Testimony of Molly Bride

Molly Bride, an expert in the field of DNA analysis, was employed as a DNA analyst by the Louisiana State Police in September 2010. On 21 September 2010, she processed the buccal swabs obtained from Spratt and compared the |TSresults with the results from the Louisiana rape kits. The results matched Spratt’s profile.

Testimony of George Jackson

Officer George Jackson, a latent print examiner with the NOPD, testified that he took Spratt’s fingerprints and compared them with fingerprints from the pen packs from Tennessee. Spratt’s fingerprints matched the fingerprints from the Tennessee pen packs. The pen packs revealed that Spratt was convicted of five counts of aggravated rape and three counts of aggravated burglary.
The defendant’s mother, Joyce Spratt, testified on his behalf. She testified that in 1994, her son’s complexion was light brown, and he had a little beard. She stated that he was with her at her home in Aberdeen, Mississippi, on 26 December 1994, because that is the day she was having a christening party for her grandson, the defendant’s son, who was born on 8 April 1994. The party started at 6:00 p.m., and Spratt was still there when she went to bed at 11:30 p.m. Ms. Spratt stated that Spratt lived with her until 1994, when he went to college. He returned home for a while, and then moved to Tennessee to study to become a mortician. On cross-examination, she acknowledged that she could not remember what she was doing on 26 December 1998 or 26 December 1995. She admitted to a conversation with Spratt about his defense on 1 April 2011, while Spratt was in prison awaiting trial. Spratt stated therein that he did not have a defense. Ms. Spratt stated that his defense was that he was with her. She also admitted that she did not bring any photographs of the christening to trial.
Jam.
ERRORS PATENT
A review of the record for errors patent on the face of the record reveals none.
IV.
ASSIGNMENTS OF ERROR

ASSIGNMENT OF ERROR NUMBER 1

In his first assignment of error, Spratt contends that the trial court erred in al *751 lowing the state to introduce evidence of the other crimes under La. C.E. art. 412.2. He contends that the prejudicial effect of the introduction of the prior crimes substantially outweighs any probative value. He complains that more time was spent on the live testimony concerning his prior convictions than the present offenses.
La. C.E. article 412.2 provides:
A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule.
A trial court’s ruling on the admissibility of evidence will not be overturned absent an abuse of discretion. State v. Wright, 11-0141, pp. 10-11 (La.12/6/11), 79 So.3d 309, 316, citing State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675, 684. This same standard is applied to rulings on the admission of other crimes evidence under La. C.E. art. 404 B(l) and evidence under La. C.E. art. 412.2. Wright, id.
In order for any evidence to be admissible pursuant to La. C.E. art. 412.2, it must pass the balancing test of La. C.E. art. 403, which provides: “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” Addressing the meaning of the “unfair prejudice” component of the balancing test, in State v. Rose, 06-0402, p. 13 (La.2/22/07), 949 So.2d 1236, 1244, citing State v. Germain, 433 So.2d 110, 118 (La.1983), the Supreme Court noted that “[a]ny inculpatory evidence is ‘prejudicial’ to a defendant, especially when it is ‘probative’ to a high degree.” The Court further noted that “[a]s used in the balancing test, ‘prejudicial’ limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.” In this context, unfair prejudice thus means “the offered evidence has ‘an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.’ ” State v. Henry, 11-1137, p. 9 (La.App. 4 Cir. 10/24/12), 102 So.3d 1016, 1022, writ denied, 12-2520 (La.4/26/13), 112 So.3d 838, quoting George Pugh, Robert Force, Gerard Rault, & Kerry Triche, HANDBOOK ON LOUISIANA EVIDENCE LAW, Author’s Note (3), La. C.E. art. 403, p. 380 (2011), citing the Advisory Committee’s Note to Federal Rule 403. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. State v. White, 09-0025, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204.
|21In the present case, the five victims from Tennessee testified and recounted the rapes. Their testimony showed a similar behavior pattern, involving the use of similar weapons. Expert testimony *752 identified Spratt as the perpetrator of the rapes in Tennessee and the present offenses. Each of the victims from Tennessee identified Spratt at trial as the perpetrator of her respective rape.
As noted above, “[a]ny inculpatory evidence is ‘prejudicial’ to a defendant, especially when it is ‘probative’ to a high degree.” Rose, 2006-0402, p. 13, 949 So.2d at 1244. The testimony from the Tennessee -victims could be considered as prejudicial to Spratt because it presents him as a serial rapist and multiple offender. However, the testimony of the three victims in the present case also suggests that view of him. Further, the testimony is probative because its shows a similar modis operan-di and use of similar weapons. While the testimony may be prejudicial, it is not unfairly prejudicial because it did not suggest a decision on an improper or emotional basis. The victims’ testimony was corroborated by objective, scientific DNA evidence. The trial court did not err or abuse its discretion when it allowed the introduction of the evidence concerning the defendant’s prior convictions.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER %

The defendant argues that La. C.E. article 412.2 is unconstitutional. However, this issue was not raised in the trial court. Thus, the defendant is precluded from raising this issue on appeal. La.C.Cr.P. art. 841.
JiiV.
CONCLUSION
For the foregoing reasons, we affirm Jimmie Spratt’s conviction and sentence.
AFFIRMED.

. Only the initials of victims are used herein to protect their identity.

. See State v. Prieur, 277 So.2d 126 (La.1973).